RALPH G. FARNUM, Plaintiff, v. PEGGY O'NEILL, Defendant.

Municipal Court of New York, Borough of Manhattan, Fifth District, October 14, 1931.

*Deiches, Kaufman, Feldstein & Bernson* [*James Bernson* of counsel], for the plaintiff.

*Sydney M. Kaye* [*Adolph Kaufman* of counsel], for the defendant.

LEWIS, DAVID C., J. This controversy arises out of a contract between an " inexperienced " performer (described as " unfamiliar in the details of obtaining engagements ") and an " expertly qualified " manager.

The agreement bears date July 26, 1928, the defendant at that time being only nineteen years of age.

From the features of the document one reads its parentage.

Prolific provisions, securing for the plaintiff the exclusive benefit of defendant's services and his continued right to share in her earnings; also purporting to endow him with an irrevocable extensive power of attorney; and including an assignment of wages, together with incidental clauses explicitly exempting the plaintiff from any equally exacting corresponding obligations, warrant the surmise that the only hand the defendant had, if any, in the preparation of this document was " her hand and seal."

In the agreement we read that the plaintiff " is not employed by the artist or obliged to procure or provide the artist with engagements or offers or promises of information where engagements may be procured."

Such an express provision is manifestly not implicit with mutual obligations. (*Wood* v. *Duff-Gordon*, 222 N. Y. 88.)

However, two months after the creation of the original contract plaintiff apparently recanted and volunteered to guarantee the defendant twenty weeks' work per year at about $100 a week.

The plaintiff by this document completely ties up the infant defendant for a straight term of five years, securing for himself the option of an additional term of five years at the expiration of the original period. And it is by virtue of this paper that the plaintiff now seeks ten per cent of the proceeds of the defendant's personal labors.

At the threshold certain inhibitions of the General Business Law and the defendant's infancy at the time of the execution of the contract challenged the plaintiff's right to a recovery.

Here we have a contract involving not a single transaction, like the purchase and sale of some commodity or property, but an agreement primarily and essentially covering the right to the personal services of the infant defendant and looking entirely to the future for performance. To sustain it binds and obligates the defendant to the exclusive control of the plaintiff for several years.

At any rate the defendant's infancy at the time of the making of the agreement rendered it voidable. (*Casey* v. *Kastel*, 237 N. Y. 305; *Washington St. Garage* v. *Malloy*, 230 App. Div. 266; *Wyatt* v.

*Lortscher,* 217 id. 224; *Saxe* v. *Neil,* 221 id. 492; *Ramsdell* v. *Coombs A. Co.,* 161 N. Y. Supp. 360.)

To cure this impairment the plaintiff must establish a ratification of the agreement by the infant defendant after she attained her majority.

The burden of establishing such a ratification is upon the plaintiff. (*International Text Book Co.* v. *Connelly,* 206 N. Y. 188; *Healy* v. *Kellogg,* 145 N. Y. Supp. 943.)

The entire proof of ratification, submitted by the plaintiff, is constituted of communications (addressed by the infant defendant within a period of two or three months following her twenty-first birthday) in which, responding to the requests of the plaintiff, the defendant remitted some commissions on wages earned and received by her prior to her majority.

These letters in themselves are neither conclusive nor controlling on the issue of ratification. (*Miner, etc., Co.* v. *Santley,* 150 N. Y. Supp. 71; *Healy* v. *Kellogg, supra; Saxe* v. *Neil, supra.*)

No substantial contractual services were rendered by the plaintiff to the defendant subsequent to her becoming of age. The theatrical engagements secured by her after her majority were procured through her individual efforts.

It can be fairly stated that subsequent to attaining her majority the defendant did not enjoy any real or substantial benefits of the contract, and any alleged ratification can claim no support on such a theory.

Nor can the plaintiff successfully count on the defendant's conduct to establish ratification, unless from the acts of the defendant one can spell an intent to affirm the contract. For intent on the part of the infant to ratify is of the very vitals of ratification. (*International Text Book Co.* v. *Connelly, supra.*)

One is justly unwilling to presume an irrevocable intent to affirm a contract from the mere conduct of a girl just attaining age, acting unaware of her right to disaffirm.

Ratification looks to one's intent to affirm; an intent inferring knowledge of one's rights to affirm or disaffirm.

If the court's guardianship of an infant is to serve any practical ends, would it not seem in keeping with equity and common sense that before we commit the infant to the exercise of such an election (about which she may have remained ignorant) to require the plaintiff to establish that either (1) the defendant knew of her right to make an election, or (2) that the adult plaintiff advised her of this right. For contracts made during infancy, and resting upon ratification for their validity, are not classed and considered

as identical with the transactions of the infant conducted after attaining majority.

The latter create new and original rights and obligations, free and independent of any assumed or entered into during infancy.

Ratification does not create a right; but merely terminates the privilege which the law gives an infant of avoiding a contract entered into when under age.

" Where the defense is of this nature it *is not the new promise or ratification* so called which gives rise to the right of action. Rather it is true that the defense or privilege given by the law never extended beyond permitting the defendant *when apprised* of the facts on which his rights depend to withdraw from the transaction. * * * As to transactions *executory on both sides, it is probable that no action need be taken by the defendant until demand is made upon him for performance, and that he may then assert the defence.*" (Italics mine.) (Williston Cont. § 204, p. 409; see, also, § 239.)

" The act, promise, or declaration relied upon must have been deliberately and understandingly done or made, and there must have been an intention to ratify." (22 Cyc. 604.)

" But there are many authorities asserting that it is essential to the validity of the ratification that the late infant at the time of such ratification knew that the transaction was not binding upon him." (31 C. J. 1063.)

Even the adverse holdings stress the significance of this element of knowledge of his rights by the infant.

" It is sufficient to say that there is no evidence to show he was ignorant of his rights. He is presumed to know the law, and I think the presumption is that he knew the facts necessary to establish his exemption from legal liability, before making the new promise. It seems he found them out when he was sued, and it does not appear that any additional information was communicated to him in the meantime." (*Taft* v. *Sergeant*, 18 Barb. 320.)

But this ancient heralded presumption that " a man is presumed to know the law," is no longer the fetish it was of old. The limitations of this commonly accepted aphorism have been eloquently elucidated by one whose opinions command respect.

" No presumption exists that all men know the law. The maxim ' a man is presumed to know the law,' is a trite, sententious saying, ' by no means universally true.' Ignorance of the law does not excuse persons so as to exempt them from the consequences of their acts, such as punishment for criminal offenses. Government could not be carried on if men were permitted to excuse their misconduct by pleading ignorance of the law. Speaking broadly, we may say that all persons are treated as if they knew the law in passing on

the character of their acts. In that qualified sense is knowledge of the law imputed to everyone. (Broom's Legal Maxims [9th ed.], p. 178.)

" If ignorance of the law did not in fact exist, we would not have lawyers to advise and courts to decide what the law is. Every one would know the law and it would be applied uniformly when the facts were known to the parties; yet the law of a particular case is often known only as the courts decide it." (*Municipal Metallic Bed Mfg. Corp.* v. *Dobbs,* 253 N. Y. 317.)

And it is worthy of note that in the instant case the infant did not rest only on proof of her infancy. She submitted testimony of her ignorance of her rights.

To my mind the proof presented does not invite the conclusion or the presumption that upon attaining age the infant acted either with knowledge of her right to disaffirm, or with an intent to ratify.

The plaintiff failed to establish ratification.

The defendant also contends that the contract cannot be enforced because of the provisions of sections 170 *et seq.* of the General Business Law, as amended.

If the plaintiff was engaged in the *business* of a theatrical employment agency as defined by the statute he cannot recover unless he pleads and proves compliance with its terms or unless this transaction falls within the specific exception provided by the statute. (*United Booking Office of America* v. *Gaynor,* 185 Fed. 1003; *Meyers* v. *Walton,* 76 Misc. 510.)

If one reads subdivisions 2, 3 and 4 of section 171 and also sections 180 and 183 of the General Business Law, as amended, together with the amendments, he notes the particularity with which the Legislature sought to cover the *business* of a theatrical employment agency and of any person engaged in the conduct of such business.

Separate sections were entirely and exclusively devoted to defining and regulating employment and theatrical engagements.

If we look only to the language of the law to discern its intent, it is difficult to escape the impression that the Legislature aimed at covering the entire field involved in securing employment for any performer, whether in the circus, vaudeville, theatrical or other entertainments or exhibitions regardless of how, or where, or even the manner in which the business of securing or providing or promising such employment may be conducted; including also the giving of information as to where such employment might be provided or procured.

And it seems significant that the statute was amended in 1917 so as to specifically exempt from its provisions the business of

managing entertainments or the artists or attractions constituting the same where such business only *incidentally* involves the seeking of employment therefor.

Section 171, subdivision 4,* reads: "The term 'theatrical employment agency' means and includes the *business* of conducting an agency, bureau, office or any other place for the purpose of procuring or offering, promising or attempting to provide engagements for circus, vaudeville, theatrical and other entertainments or exhibitions or performances, or of giving information as to where such engagements may be procured or provided, whether such business is conducted in a building, on the street or elsewhere, but such term does not include the business of managing such entertainments, exhibitions or performances, or the artists or attractions constituting the same, where such business only *incidentally* involves the seeking of employment therefor."

These parties, however, made the matter of securing employment the exclusive and special subject of a separate subsequent agreement.

What, then, was the status of the parties?

This defendant was not a soloist; nor apparently was she to be starred, or to act in an ensemble. She had been a vaudeville performer. At the end of her vaudeville engagements she sought further theatrical employment. Thereupon the contract with the plaintiff was executed.

Does a song and dance artist seeking employment, by signing the agent's form of contract *ipso facto* become an artist of unique ability? Does a performer applying to one for a theatrical engagement by the same token hire him as a manager?

In law there can be no such magic in words.

Though the absence of any express provision or phrase from a contract need not constitute a fatal omission in a document, "The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal. It takes a broader view today." (*Wood* v. *Duff-Gordon, supra.*) The mere presence of words need not save an instrument from otherwise fatal objections. The facts, not the form, should control.

The application of the provisions of the General Business Law to transactions within its purview is not dependent upon the language of a private contract. To the contrary, it would seem that in such instances the terms of the statute should regulate the provisions of a contract. (See Gen. Business Law, § 183, as amd. by Laws of 1916, chap. 587.)

---

*Formerly subd. 3, as amd. by Laws of 1917, chap. 770, and renum. § 4 by Laws of 1927, chap. 320.— [Rep.

However, I do not regard the proof upon the trial sufficient to warrant a positive conclusion that the plaintiff was maintaining a theatrical employment agency, within the inhibitions of the statute.

The court disposes of that issue upon the proof here submitted.

For the foregoing reasons the complaint must be dismissed and judgment rendered in favor of the defendant.